UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN G. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV1168 CDP |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Steven Johnson's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et*

*seq.*, and supplemental security income benefits under Title XVI of the Social

Security Act, 42 U.S.C. §§ 1381 *et seq.* Claimant Johnson brings this action

alleging disability due to a learning disability. The Administrative Law Judge

concluded, however, that Johnson is not disabled, and Johnson now appeals that

decision. Because I find that the overall decision denying benefits was supported

by substantial evidence, I will affirm.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14,
2013. As such, she should be substituted for Michael J. Astrue as the defendant in this suit. Fed.
R. Civ. P. 25(d).

## Procedural History

On April 9, 2010, Steven Johnson filed for supplemental security income payments and disability insurance benefits. The Social Security Administration denied Johnson's application at the initial level. Missouri is one of several states participating in modifications to the disability determination procedures, which include the elimination of the reconsideration step in the administrative appeals process. 20 C.F.R. § 416.1406, 416.1466 (2011). Johnson's appeal in this case therefore proceeded directly from this initial denial to the administrative law judge level. Johnson appeared and testified at a hearing on December 1, 2010. The ALJ issued an opinion on December 16, 2010 upholding the denial of benefits. Johnson filed a request for review with the Appeals Council on January 18, 2011. The Appeals Council denied Johnson's request for review on May 1, 2012. Accordingly, the ALJ's determination stands as the Commissioner's final determination. Johnson filed this request for review on June 29, 2012.

## Testimony Before the ALJ

At the time of the administrative hearing, Johnson was forty-four years old. Although he was a high school graduate, he cannot read and write. Johnson testified that he had been in special education classes throughout his schooling. He stated that he lived with his brother and his brother's wife. Johnson had lived with his brother since 1990, with the exception of a one-month period he tried living on

his own.

Johnson stated that he did not work at the time of the hearing, but occasionally did some odd jobs at his brother's store, for which he was paid up to thirty dollars. Johnson also said that a friend, Ty Harrington, occasionally paid him forty-five dollars or so to dust and clean his home, to help keep Johnson out of trouble. He testified that his most recent job was doing landscaping work in 2004 for William L. Brown Landscaping. In 2001, he worked for Trans World Airlines, restocking the airplane snack carts. Johnson had difficulty remembering all of the jobs he had held. He testified to having done janitorial work for a school, assembly line work for Titan Tube Fabricator and Osceola Products, and landscaping work for some temporary services. He held most of these jobs for a period of a few months, and the earliest work Johnson testified to was janitorial and lawn care work for Arkansas Bank in 1993 and 1994.

Johnson testified that he was incarcerated from 2008 to 2010 for possession of a controlled substance. Johnson stated that while in prison they tried to give him job assignments, such as working in the kitchen, but he was unable to do them because of back and leg pain. He stated that there are mornings he cannot get up because his back hurts, and during the day he has to sit down and elevate his legs because of leg pain. Johnson believed this pain had been occurring for three or four years. Johnson testified that he had difficulty keeping jobs because he had

trouble remembering instructions and had to be told the same things repeatedly.

Johnson stated he could lift thirty or fifty pounds, but does not try to lift anything anymore. Johnson further testified that he could only stand for about thirty minutes before he needed to sit and rest. He could also rest for about thirty minutes, and then needed to alternate positions. Johnson stated that he could walk, and that he could mow the lawn pushing a mower but it would start to hurt after a while.

Johnson testified that he was unable to read and write. He stated that he could perhaps read a small word, but nothing more, including items on a grocery list. Johnson testified that he went to the grocery store and was able to purchase necessary items, but was unable to do so with a written list because of his illiteracy. He could pay with paper money and coins, and know whether he received correct change. He stated that his sister-in-law did all of his reading and paperwork for him.

Johnson testified that he only prepared simple food for himself, like cereal. He helped around the house in tasks such as vacuuming or taking out the trash. Johnson also stated he did his own laundry. He testified that he did not currently have a driver's license, but he had previously. Johnson spent most of his time watching television or sitting at his brother's store.

The ALJ called a vocational expert, James Israel, who had been provided

with and reviewed Johnson's file, including his past work history. Israel testified that Johnson tested at the illiterate level for reading and spelling. He further testified that Johnson had previously worked in packaging, unskilled and heavy in actual performance, general labor in transporting duties, unskilled and heavy, janitorial or cleaning jobs, unskilled and light or medium in actual performance, lawn care work, unskilled and heavy, and assembler or production jobs, unskilled and light. Israel also noted that Johnson had done various other jobs under the general title of laborer or sorter, which were unskilled and medium in exertion.

The ALJ described a hypothetical individual for Israel who was 44, illiterate, and had an equivalent work history to Johnson; who had no exertional limitations; who was limited to unskilled work with simple routine tasks that do not require reading or writing; and who could follow oral directions. The ALJ then asked Israel whether this hypothetical person could perform Johnson's past work. Israel replied that such an individual could perform several of the cleaning jobs, several of the labor jobs, and some of the packer jobs. Israel excluded the lawn care work because it was classified as semiskilled. Israel clarified that as performed, Johnson's past law care work was unskilled, and so the hypothetical person could perform those jobs as performed, but not as listed by the Dictionary of Occupational Titles. The ALJ asked Israel whether there were any other jobs the hypothetical individual could complete. Israel replied that such an individual

could work in medium-exertion jobs, such as a packager, an assembler of component parts, or a bulk packer, as well as various other jobs in the light and heavy-exertion categories.

Upon questioning from Johnson's attorney, the ALJ recited the Dictionary of Occupational Titles' definition of "level one reasoning development" as the ability to "apply common sense, understanding to carry out simple, one or two step instructions, deal with the standardized situations with occasional or no variables in or from the situations encountered on the job." The ALJ then asked Israel whether Johnson's past work was commensurate with that definition, and Israel replied that it was. The ALJ also asked Israel whether the work he identified in response to the hypothetical was commensurate with the definition. Israel replied that it was.

## Medical Records

From November of 2008 until his release in January 2010, Johnson had multiple mental health evaluations and medical visits while incarcerated. On November 6, 2008, Johnson was seen for an intake mental health interview with the Department of Corrections. Johnson reported no history of health issues, and presented no symptoms of depression, psychosis, or delusions. Johnson met with a DOC counselor on December 10, 2008, and reported getting along with his "cellies." Johnson also reported that he spent his time reading, but had difficulty

obtaining his glasses.

On November 11, 2009, Johnson had another DOC mental health visit, where he presented as calm, with logical flow of thought and good insight. He reported that he read at a third grade level. The counselor noted that Johnson had some impulse control issues. Johnson expressed a desire to go to a year-long program for his substance abuse, and was encouraged to attend an anger management group. From November 30, 2009 through the end of December, Johnson attended group sessions for anger management, as well as a cognitive behavioral group.

On November 22, 2008, Johnson reported chronic back pain. He said his back had been hurting all his life, and described the pain as a 6 out of 10 while at rest, and 9 out of 10 while walking. He was referred for an evaluation for new boots. On November 28, 2008, it was noted that Johnson walked with a limp, had upper lumbar back spasms, and chronic low back strain. Johnson was given naproxen, and a spine x-ray was ordered. Johnson received his boots on December 16, 2008. On February 22, 2009 and April 7, 2009, Johnson requested special insoles for his boots. At the April visit, nurse Angela Chandler noted that there was no obvious deformity to either foot, no redness, swelling, or flat feet, and that there was no evidence insoles were needed.

On May 31, 2009, Johnson reported that he thought he pulled a muscle in his

shoulder. Nurse Erin Escamilla noted tension to the right shoulder and muscle spasms upon palpitation. Johnson was educated on applying warm packs. On July 13, 2009, Johnson presented with acute back pain. He was given acetaminophen to take as needed. On October 13, 2009, Johnson again presented with back pain and complained that he could not wear his boots. He was given naproxen and analgesic balm.

On June 4, 2010, Johnson had a psychological evaluation with Arthur C. Littleton, Ph.D. Dr. Littleton noted that Johnson's speech and language skills were understandable and within the normal range for both the receptive and expressive components. Dr. Littleton opined that Johnson was able to follow simple directions.

Dr. Littleton administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS 3) to Johnson. Johnson scored a Verbal IQ of 66, a Performance IQ of 64, and a Full Scale IQ of 63, placing him in the mentally impaired intellectual classification with a first percentile standing. Dr. Littleton noted that Johnson operated in the mentally impaired range for verbal and psychomotor capabilities, and demonstrated marked deficiencies in visual alertness to details, comprehension, and understanding abstract verbal concepts. Dr. Littleton also noted that Johnson was functionally illiterate, being incapable of understanding words and reading at a first grade level. He further observed that Johnson had

appropriate behavior and gave no indication of being isolated or socially withdrawn.  Dr. Littleton diagnosed Johnson with mild mental retardation and reading disorder.

On June 21, 2010, Robert Cottone, Ph.D., completed a questionnaire based on Johnson's records.  Dr. Cottone indicated that an RFC assessment was necessary, and that Johnson was mentally retarded with a valid verbal, performance, or full scale IQ of 60 through 70.  Dr. Cottone indicated that Johnson had mild restrictions in activities of daily living and difficulties in maintaining social functioning, and a moderate limitation in maintaining concentration, persistence, or pace.  He noted that Johnson was substantially impaired in matters of insight, judgment, reasoning, memory, perceptual organization, and comprehension, and that he would be incapable of handling funds.  Dr. Cottone further noted that Johnson could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers or supervisors, and adjust adequately to ordinary changes in the work routine or setting.

Johnson was evaluated by Amy J. Marty, Ph.D., on August 3, 2010.  Johnson complained to Dr. Marty of difficulty reading and memory problems.  Dr. Marty reported that Johnson had difficulty with information processing and with recalling specific dates of personal history.  She noted that he was coherent,

logical, and attentive, but he had significant problems in receptive or expressive language ability, with delayed responses to questions. Dr. Marty further noted that Johnson evidenced an ability to maintain adequate attention and concentration with appropriate persistence and pace throughout the evaluation. The Wechsler Adult Intelligence Scale – 4th Edition (WAIS-IV), Wide Range Achievement Test-Revision 3 (WRAT-3) and Minnesota Multiphasic Personality Inventory, 2nd Edition (MMPI-2) were administered. Dr. Marty noted that Johnson appeared to understand instructions and completed tasks to the best of his ability, making the test results reliable and valid.

On the WAIS-IV, Johnson scored a 63 on Verbal Comprehension, 67 on Perceptual Reasoning, 74 on Working Memory, 81 on Processing Speed Index, and a Full Scale IQ of 65. All scores were in the extremely low, borderline, or low average ranges. Dr. Marty noted that the scores indicated a diagnosis of Borderline Intellectual Functioning with overall cognitive and intellectual functioning in the upper end of extremely low range to lower end of the borderline range. She further noted that Johnson's performance indicated the presence of a learning disability with significant differences between index scores. Johnson's scores on the WRAT-3 were equivalent to a first grade level in reading and spelling and a fifth grade level in arithmetic, further indicating the presence of a learning disability. Johnson's results on the MMPI-2 were indicative of depression, anxiety, feelings

of guilt, rumination, agitation, and fearfulness, but Dr. Marty noted that Johnson denied any such feelings and no evidence of these behaviors was observed during the assessment. Dr. Marty diagnosed Johnson with learning disability NOS and borderline intellectual functioning, and assigned a GAF of 70.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 200) (citation omitted).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)      the credibility findings made by the Administrative Law Judge;

(2)      the education, background, work history, and age of the claimant;

(3)      the medical evidence from treating and consulting physicians;

(4)      the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)      any corroboration by third parties of the plaintiff's impairments; and

(6)      the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) and 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v.*

*Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Hecler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
>
> 2. the duration, frequency, and intensity of the pain;
>
> 3. precipitating and aggravating factors;
>
> 4. dosage, effectiveness and side effects of medication;
>
> 5. functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Johnson was not disabled within the meaning of the Social Security Act from December 31, 2004 through the date of the decision. He issued the following specific findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.

2. The claimant has not engaged in substantial gainful activity since December 31, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971, *et seq.*).

3. The claimant has the severe impairment of mild mental retardation (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the nonexertional limitations that he is limited to unskilled work with simple routine tasks that do not require reading or writing. The claimant can follow oral directions.

6. The claimant is capable of performing his past relevant work as assembler and packer, lawn care worker, and general laborer and transporter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The ALJ concluded that Johnson did not have a physical or other mental impairment imposing an additional and significant work-related limitation to his severe impairment of mild mental retardation. He further concluded that Johnson had only mild restrictions in activities of daily living, mild difficulties in social functioning, no episodes of decompensation, and moderate difficulties in concentration, persistence, or pace. The ALJ considered all of Johnson's symptoms in determining his residual functional capacity. He noted that the only documented impairment was mental retardation, and that Johnson's alleged head injury was not medically documented, and his claims of foot and back problems

were never supported by treating physicians.

The ALJ found it significant that Johnson had performed substantial gainful activity in the past despite his life-long mental retardation. He afforded great weight to Dr. Littleton's opinion that Johnson's mild mental retardation caused his illiteracy, and to the state agency psychologist's (Dr. Cottone) opinion that was consistent with Dr. Littleton. Little weight was afforded to Dr. Marty's finding that there was a borderline range IQ with learning disorder because Johnson's MMPI-2 scores did not parallel his presentation and behavior, and because Dr. Marty did not have any additional records available. The ALJ did not find Johnson's allegations fully credible because they were inconsistent with his prior work experience and the medical records.

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). On appeal, Johnson raises two issues. He argues that the ALJ erroneously

considered Johnson's reading disorder to be a manifestation of Johnson's intellectual functioning, and that the ALJ's conclusions regarding Johnson's limitations were not supported by substantial evidence in the record. Because I find that the ALJ's decision is supported by substantial evidence in the medical record, I will affirm.

### The ALJ did not Err in Finding that Johnson did not Meet Listing 12.05C

Johnson argues that the ALJ erred by failing to find that Johnson's impairments met Listing 12.05C. He argues the ALJ erred in failing to recognize Johnson's reading disorder as sufficient to constitute an "other" impairment for purposes of the listing. Listing 12.05C requires: (1) a valid verbal, performance, or full-scale IQ between 60 and 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006); 20 C.F.R. Part 404, Subpt. P, App. 1 § 12.05C. A physical or other mental impairment imposing an additional and significant work-related limitation of function requires "a more than slight or minimal" effect on the claimant's ability to work, but need not be independently disabling. *Sird v. Chater*, 105 F.3d 401, 403 (8th Cir. 1997) (citing *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir. 1986)). The impairment cannot be a symptom or manifestation of the claimant's intellectual functioning. *Buckner v. Apfel*, 213 F.3d 1006, 1012 (8th

Cir. 2000).

The ALJ found that although Johnson's Full Scale IQ of 63 satisfied the first criterion, Johnson had no physical or other mental impairment imposing an additional and significant work-related limitation. While discussing Johnson's residual functional capacity, the ALJ stated that "great weight is afforded to Dr. Littleton that mild mental retardation causes the claimant's illiteracy." Johnson argues that the ALJ erred in finding Johnson's illiteracy to be a manifestation of his intellectual functioning, citing *Kliment v. Astrue*. 710 F. Supp. 2d 831, 850 (N.D. Iowa 2010). *Kliment* quotes the DSM-IV, which describes a reading disorder as "reading achievement that falls substantially *below that expected given the individual's* chronological age, *measured intelligence*, and age-appropriate education." *Id.* at 850 (emphasis added); Diagnostic and Statistical Manual of Mental Disorders 48, § 315.00 (Am. Psychiatric Ass'n, 4th ed. 1994). In other words, a reading disorder does not merely mean low reading achievement; it means reading achievement that is even lower than what would be expected given a claimant's intellectual functioning. *See id.* at 850-51. Accordingly, the court in *Kliment* held that "there is support" for the claimant's proposition that a diagnosis of reading disorder is separate from mild mental retardation. *Id.* at 850-51.

The Eighth Circuit has not specifically addressed whether a reading disorder can be a manifestation of mental retardation. However, in *Buckner* the Eighth

Circuit held that the claimant's disorders, including a learning disability, were "merely symptoms or manifestations of [claimant's] mental retardation and thus cannot satisfy her obligation to show an additional impairment." 213 F.3d at 1012. Like reading disorders, the DSM-IV lists a learning disability as an impairment that is considered in comparison to expected performance given IQ. DSM-IV at 53, § 315.9. It stands to reason, then, that the Eighth Circuit would treat reading disorders the same way.

Two other Circuits have affirmed ALJ decisions which found that the claimant's illiteracy was a symptom or manifestation of his or her mental retardation, and not an additional impairment. *Hartzog v. Barnhart*, 189 F. App'x 98, 100 (3rd Cir. 2006); *Franklin v. Chater*, No. 96-5086, 1996 WL 731591, at *3 (10th Cir. Dec. 20, 1996). In *Franklin*, the Tenth Circuit found it significant that the medical evidence showed the claimant was capable of performing a routine and repetitive task, and therefore his mental impairment did not keep him from doing some work. 1996 WL 731591, at *3. In *Kliment*, the Northern District of Iowa case relied on by Johnson, the court held that even if the reading disorder is considered separate from mental retardation, it "must, nevertheless, impose 'an additional and significant work-related limitation of function.'" 710 F. Supp. 2d at 851.

Given these cases, I therefore find that the ALJ's finding that Johnson did

not meet or equal Listing 12.05C was supported by substantial evidence in the record. Like the claimant in *Franklin*, Johnson had previously held jobs constituting substantial gainful activity in spite of his illiteracy, and was able to perform routine and repetitive tasks. Dr. Cottone, the state agency psychologist, whose opinion the ALJ gave great weight, reviewed Johnson's medical records and reported that Johnson could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers or supervisors, and adjust adequately to ordinary changes in the work routine or setting. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). In evaluating the opinion of the state agency physician, the ALJ will weigh the findings of the consultant using the relevant factors in paragraphs (a) through (e) in 20 C.F.R. § 404.1527 and § 416.927, as the ALJ would in evaluating the opinions of other medical sources. *Id.*

The ALJ also noted that Johnson had previously held jobs constituting substantial gainful activity and there was no evidence that his condition had changed or worsened since that time. Accordingly, the ALJ's finding that Johnson's illiteracy did not impose an additional and significant work-related

limitation of function to his mild mental retardation was supported by substantial evidence in the record.

## The ALJ's Conclusions Regarding Johnson's Impairments are Supported by Substantial Evidence in the Record

Johnson argues that in applying psychiatric review technique analysis, the ALJ's findings were not supported by substantial evidence. Psychiatric review technique analysis "is required to be conducted and documented at each level of the review process," and "involves determination of whether there is a mental impairment followed by a rating of the degree of functional limitation resulting from the mental impairment." *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007); 20 C.F.R. § 416.920a(a)-(e). Johnson agrees that the ALJ applied the technique. In so doing, the ALJ found Johnson would have only moderate limitations in regard to concentration, persistence or pace, that he had no episodes of decompensation, and only mild limitations in activities of daily living and social functioning.

Johnson only contests the finding of a moderate limitation in regard to concentration, persistence, or pace. He argues that the ALJ failed to reconcile conflicts in the medical record, and erred in relying on his own observations of Johnson rather than the medical record. In discussing concentration, persistence, or pace, the ALJ cited Dr. Littleton's report, which noted that Johnson had "quite poor" memory, comprehension, and insight. The ALJ also noted that Johnson's

concentration was sufficient to follow the proceedings of his hearing with no apparent difficulties.

"An ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). It is clear from his opinion that the ALJ considered more than just Dr. Littleton's note on Johnson's comprehension and the ALJ's own observations in making his determination. The ALJ also stated that he gave "great weight" to Dr. Cottone's opinion. After reviewing Johnson's records, Dr. Cottone identified Johnson as being moderately impaired as to concentration, persistence, or pace, the same conclusion the ALJ ultimately reached. While Johnson characterizes Dr. Cottone's conclusions as being inconsistent with Dr. Littleton's, Dr. Littleton never spoke directly to concentration, persistence, or pace, nor did he complete a residual functional capacity assessment. Dr. Littleton did note that Johnson's language skills were within the normal range, there were no problems with rate, and Johnson was able to understand and follow simple directions. Furthermore, within his own report, Dr. Cottone noted both that Johnson had only moderate impairment of concentration, persistence, or pace, but also was "substantially impaired" in memory, comprehension, and reasoning, thus evidencing that Dr. Cottene did not consider the two inconsistent. It should be

further noted that even Dr. Marty, whose opinion the ALJ gave only little weight, was consistent in finding that Johnson evidenced an ability to maintain adequate and concentration with appropriate persistence and pace.

The ALJ also repeatedly cited Johnson's past work and his ability to complete activities of daily living as being inconsistent with Johnson's testimony and claims. When adequately explained and supported, credibility determinations are for the ALJ to make. *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). Furthermore, the court may not reverse the ALJ's decision merely because substantial evidence would also support an opposite conclusion. *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999); *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998). *See also Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (internal quotations omitted). Taken as a whole, there is substantial evidence on the record to support the ALJ's findings.

Even if the ALJ had erred in not finding that Johnson had marked difficulties in maintaining concentration, persistence, and pace, this would have constituted harmless error since it is clear that he would not have decided differently even absent the error. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008). Listing 12.05D requires a valid verbal, performance, or full scale IQ of

60 to 70 and at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace, or 4. Repeated episodes of decompensation, each of extended duration." *Hadley v. Astrue*, No. 4:11CV602 TIA, 2012 WL 4479121, at *8 (E.D. Mo. Sep. 28, 2012) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05D).  The ALJ found that Johnson had only mild restriction of activities of daily living and social functioning, and no repeated episodes of decompensation, and Johnson did not challenge any of these findings.  Johnson's impairment would not have met or equaled Listing 12.05D even if the ALJ erred in failing to find that he had marked difficulties in maintaining concentration, persistence, or pace.

For the reasons discussed above, I find that the decision denying benefits was supported by substantial evidence, and I will affirm the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 10th day of July, 2013.